IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY C. ROTH,<br> ON BEHALF OF LESTER L. BOWER, JR.,<br><br>    Plaintiff,<br><br>            v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. A. No. 08-00822 (ESH)

## <u>DECLARATION OF DAVID M. HARDY</u>

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 204 employees who staff a total of ten (10) Units and a field operational service center whose

collective mission is to effectively plan, develop, direct, and manage responses to requests for

access to the Federal Bureau of Investigation ("FBI") records and information pursuant to the

FOIA; Privacy Act of 1974; Presidential, Attorney General and FBI policies and procedures;

judicial decisions; and Presidential and Congressional directives.  The statements contained in

this declaration are based upon my personal knowledge, upon information provided to me in my

official capacity, and upon conclusions and determinations reached and made in accordance

therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Specifically, I am aware of the

treatment which has been afforded the FOIA/Privacy Act requests made by plaintiff Anthony C.

Roth, who, on behalf of Lester L. Bower, Jr., seeks access to records concerning Mr. Bower, as

well as other third-party individuals (hereinafter "plaintiff") from FBIHQ and the FBI's Dallas

Field Office.

(4)     The FBI reviewed a total of 1,944 pages responsive to plaintiff's request and on

October 10, 2008, released to plaintiff a total of 1,130 pages.  In accordance with <u>Vaughn v.</u>

<u>Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), this declaration, which is being submitted in support of

defendant FBI's motion for summary judgment, will provide the Court and plaintiff with an

explanation for the procedures used to review and process FBIHQ and Dallas Field Office

("DLFO") records responsive to plaintiff's FOIA/Privacy Act requests, and a justification for the

FBI information which has been withheld from disclosure in full or in part pursuant to Privacy

Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and FOIA Exemptions 2, 3, 5, 6, 7(C), 7(D), and

2

7(E), 5 U.S.C. §§ 552 (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## CRIMINAL HISTORY OF LESTER L. BOWER, JR.

(5)     In April 1984, Lester L. Bower, Jr. was convicted of four capital murders in the

15th Judicial District Court, Grayson County, Texas. The case evidence at trial supported capital

murder convictions for killing four persons in the course of stealing an ultra light aircraft. A jury

recommended that the sentence imposed should be death. On July 1, 2008, a Texas court stayed

Mr. Bower's July 22, 2008 execution date until a determination could be made on his Application

for Writ of Habeas Corpus.

## PROCEDURAL HISTORY OF PLAINTIFF'S FOIA/PRIVACY ACT REQUESTS

(6)     By letter dated January 31, 2007, Mr. Roth of the law firm of Morgan, Lewis &

Bockius, LLP, submitted to FBIHQ a FOIA/Privacy Act request seeking "any and all records in

your files pertaining to the following individuals or entities: (1) Lester Leroy Bower, Jr. (Date of

Birth xx/xx/47 Kansas City, MO); (2) Bob Tate or Bobby Glen Tate (Date of Birth 03/13/31;

Date of Death 10/08/83); (3) Phillip Boyce Good (Date of Birth 10/09/53; Date of Death

10/08/83); (4) Ronald Howard Mayes (Date of Birth 02/04/46; Date of Death 10/08/83); (5) Jerry

Mac Brown (Date of Birth 05/20/32; Date of Death 10/08/83); (6) Grayson County (Texas)

Sheriff's Department and anyone associated with it; (7) Jerry Buckner; (8) The investigation of

the October 8, 1983 murders of Bobby (Bob) Tate, Phillip Boyce Good, Ronald Howard Mayes,

and Jerry Mac Brown in Sherman, Texas; (9) Brett ("Bear") Leckie; (10) Chestley ("Ches")

Galen Gordon (Social Security Number xxx-xx-3406; Date of Birth xx/xx/54); (11) Lynn

Langford (Social Security Number xxx-xx-0758); and  (12) Robert ("Rocky") T. Ford (Social

3

Security Number xxx-xx-9361)."[1]  (See Exhibit A.)

(7)    By letter dated March 22, 2007, the FBI advised plaintiff that no records[2] responsive to his FOIA/Privacy Act request dated January 31, 2007, were located by a search of the automated indices to the Central Records System ("CRS").  Plaintiff was advised that he could file an administrative appeal with the Office of Information and Privacy ("OIP"), Department of Justice ("DOJ"), within sixty days.  (See Exhibit B.)

(8)    By letter dated January 3, 2008, plaintiff submitted to FBIHQ a FOIA request seeking "any and all records in your files pertaining to the following individuals or entities: (1) Jerry Buckner; (2) Brett ("Bear") Leckie; (3) Chestley ("Ches") Galen Gordon (Social Security Number xxx-xx-3406; Date of Birth xx/xx/54); (4) Lynn Langford (Social Security Number xxx-xx-0758); and (5) Robert ("Rocky") T. Ford (Social Security Number xxx-xx-9361)."  (See Exhibit C.)

(9)    By letter dated January 3, 2008, plaintiff submitted to FBIHQ a FOIA/Privacy Act

---

[1]  Mr. Roth did not file his request in a representational capacity.  The FBI was not aware until plaintiff filed this Complaint that Mr. Roth had submitted this request in a representational capacity on behalf of Lester L. Bower, Jr., a death row inmate.

[2]  On or about August 29, 1989, Grace Speights, also of Lewis, Morgan & Bockius, submitted a FOIA request seeking "any and all records in your files pertaining to the following individuals or entities: (1) Lester Leroy Bower, Jr.; (2) Bob Tate or Bobby Glen Tate; (3) Phillip Boyce Good; (4) Ronald Howard Mayes; (5) Jerry Mac Brown; (6) Grayson County Sheriff's Department and anyone associated with it; and (7) Jerry Buckner.  The FBI released 564 pages of responsive material to Ms. Speights on or about October 25, 1990.

Approximately ten years later, on or about November 12, 1999, Mr. Roth submitted a request similar to that of Ms. Speights.  The FBI released responsive material to plaintiff on or about January 31, 2001.  Then on January 31, 2007, Mr. Roth submitted his second FOIA/Privacy Act request.  Since the January 31, 2007 request was the same as his request of November 12, 1999, RIDS personnel searched for responsive records from the cutoff date of the previous search, February 1, 2000, through the cutoff date of the current search, March 22, 2007.

request seeking "any and all records in your files pertaining to the following: (1) FBI Field Office File DL 179B-97, Volume I, Serials 1-40; (2) FBI Field Office File DL 179B-97, Volume II, Serials 41-111; (3) FBI Field Office File DL 179B-97, Volume III, Serials 112-199; (4) FBI Field Office File DL 179B-97, Volume IV, Serials 200-305; (5) FBI Field Office File DL 179B-97, Volume V, Serials 306-_; (6) FBI Field Office File DL 179B-97, Volume Number 1A; (7) FBI Field Office File DL 179B-97, Volume1B; (8) FBI Headquarters File HQ 163-18573; (9) FBI File DL 62D-5174; and (10) FBI File 95-259626." (See Exhibit D.)

(10)    By letter dated January 16, 2008, the FBI advised plaintiff that no records responsive to his FOIA/Privacy Act request regarding file DL 62D-5174 (FOIA request number 1106217) were located by a search of the automated indices of the CRS at FBIHQ.  Plaintiff was also advised that should he desire a check of the FBI's field office files, it would be necessary for him to direct a request to the appropriate field office(s).  Additionally, plaintiff was advised that he could file an administrative appeal to the DOJ OIP, within sixty days.  (See Exhibit E.)

(11)    By letter dated January 16, 2008, the FBI advised plaintiff that no records responsive to his FOIA/Privacy Act request regarding file DL 179B-97 (FOIA request number 1106215) were located by a search of the automated indices of the CRS at FBIHQ.  Plaintiff was also advised that should he desire a check of the FBI's field office files, it would be necessary for him to direct a request to the appropriate field office(s).  Additionally, plaintiff was advised that he could file an administrative appeal to the DOJ OIP, within sixty days.  (See Exhibit F.)

(12)    By letter dated January 16, 2008, the FBI acknowledged receipt of plaintiff's request regarding file HQ 163-18573, advising that his request was assigned FOIA/Privacy Act request number 1106216.  Additionally, the FBI advised plaintiff that it was searching the indices

5

to the CRS for the information he requested.  (See Exhibit G.)  However, on or about April 1,
2008, the FBI contacted Mr. Roth via telephone regarding file HQ 163-18573 referenced in his
January 16, 2008 request.  At that time, the FBI advised plaintiff that the requested file number
was incorrect.  The correct file number should have been HQ 63-18573, however, that file had
been consolidated into file number 95-259626.[3]  Because file HQ 63-18573 had been
consolidated into file 95-259626, FOIA request number 1106216 was similarly consolidated with
FOIA request number 1106218.

(13)   By letter dated January 16, 2008, the FBI acknowledged receipt of plaintiff's
request regarding file 95-259626, advising that his request was assigned FOIA request number
1106218.  Additionally, the FBI advised that it was searching the indices to the CRS for the
information he had requested.  (See Exhibit H.)

(14)   By letter dated January 23, 2008, the FBI advised plaintiff that he needed to
submit proof of death or privacy waivers for the named individuals referenced in his January 3,
2008 FOIA request (i.e., Jerry Buckner; Brett Leckie; Chestley Galen Gordon; Lynn Langford;
and Robert T. Ford) before the FBI would commence searching for any documents related to
those individuals.  (See Exhibit I.)

(15)   By letter dated March 14, 2008, plaintiff submitted an appeal to OIP regarding the
FBI's January 16, 2008 response to plaintiff's January 3, 2008 request seeking files DL 62D-5174
(FOIA request number 1106217) and DL 179B-97 (FOIA request number 1106215).  (See
Exhibit J.)

---

[3]   File 95-259626 was also part of plaintiff's January 16, 2008 request. See description
under ¶13 regarding FOIA request number 1106218.

(16)     By letter dated March 18, 2008, OIP acknowledged receipt of plaintiff's March 14, 2008 appeal letter regarding file DL 62D-5174 (FOIA request number 1106217). Furthermore, OIP advised plaintiff of the substantial backlog of pending appeals. (See Exhibit K.)

(17)     By letter dated March 18, 2008, OIP acknowledged receipt of plaintiff's March 14, 2008 appeal letter regarding file DL 179B-97 (FOIA request number 1106215). Further, OIP advised plaintiff of the substantial backlog of pending appeals. (See Exhibit L.)

(18)     By letter dated March 21, 2008, plaintiff appealed to OIP the FBI's January 23, 2008 response to plaintiff's January 3, 2008 request seeking files pertaining to Jerry Buckner; Brett ("Bear") Leckie; Chestley ("Ches") Galen Gordon; Lynn Langford; and Robert ("Rocky") T. Ford (FOIA request numbers: 911507, 911508, 911509, 911510, and 911512). (See Exhibit M.)

(19)     By letter dated March 28, 2008, OIP acknowledged receipt of plaintiff's March 21, 2008 appeal letter.  Furthermore, OIP advised plaintiff of the substantial backlog of pending appeals.  (See Exhibit N.)

(20)     By letter dated April 3, 2008, OIP advised plaintiff that it had affirmed the FBI's action on plaintiff's request seeking files DL 62D-5174 (FOIA request number 1106217) and DL 179B-97 (FOIA request number 1106215).  (See Exhibit O.)

(21)     By letter dated April 15, 2008, FBIHQ advised plaintiff of the status of his pending FOIA (request number 1106218) regarding file 95-259626.  FBIHQ informed plaintiff that his request was currently being reviewed by an analyst and the analyst would confirm that all records are responsive to his request and apply exemptions allowed under FOIA.  (See

7

Exhibit P.)

(22)    On April 18, 2008, FBIHQ advised plaintiff that it had reviewed 388 pages and was releasing 376 pages with redactions in response to FOIA request number 1106218 (file 95-259626).  The FBI withheld certain information pursuant to FOIA Exemptions, 2, 3, 6, 7(C), 7(D), and 7(E).  (See Exhibit Q.)

(23)    By letter dated May 16, 2008, plaintiff appealed the FBI's April 18, 2008 response to plaintiff's January 3, 2008 request seeking file 95-259626 (FOIA request number: 1106218). (See Exhibit R.)

(24)    By letter dated May 20, 2008, OIP acknowledged receipt of plaintiff's May 16, 2008 appeal letter.  Furthermore, OIP advised plaintiff of the substantial backlog of pending appeals.  (See Exhibit S.)

(25)    By letter dated May 28, 2008, plaintiff submitted to FBIHQ a FOIA request seeking "any and all records in your files pertaining to Brett ("Bear") Leckie .... Furthermore, in accordance with 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R. § 16.5(d), I request expedited processing of this FOIA . . . I represent Lester L. Bower, Jr., who is incarcerated on death row in Texas and faces an execution date of July 22, 2008."  (See Exhibit T.)

(26)    By letter dated June 10, 2008, OIP advised plaintiff that it affirmed, on partly modified grounds, the FBI's action on plaintiff's request seeking file 95-259626 (FOIA request number 1106218).  (See Exhibit U.)

(27)    By letter dated June 12, 2008, FBIHQ acknowledged receipt of plaintiff's request regarding Brett ("Bear") Leckie, advising that his request was assigned FOIA request number 1115319.  Additionally, FBIHQ advised that it was searching the indices to the CRS for the

8

information he requested.[4]  (See Exhibit V.)

(28)    By letter dated June 13, 2008, FBIHQ advised plaintiff that it had reviewed 14

pages and was releasing 14 pages with redactions in response to FOIA request number 1115319.

Certain information was being withheld pursuant to FOIA Exemptions 6 and 7(C).  Plaintiff was

also advised that he could file an administrative appeal in writing to the DOJ OIP, within sixty

days.  (See Exhibit W.)

(29)    On June 16, 2008, plaintiff's counsel provided to defendant's counsel a copy of the

FBI's 2001 release made in response to plaintiff's 1999 FOIA request.[5]  (See Exhibit X.)

(30)    On June 17, 2008, counsel conducted a meeting to discuss plaintiff's

FOIA/Privacy Act requests.  At that time, plaintiff's counsel provided defendant's counsel a copy

of a subset of the FBI's 2001 release to plaintiff's 1999 FOIA/Privacy Act request.  Counsel

agreed that given the time constraints, the FBI would re-process the subset of documents

provided by plaintiff's counsel prior to Mr. Bower's pending execution date of July 22, 2008.

(See Status Report dated August 22, 2008.)

(31)    On July 2, 2008, plaintiff's counsel advised the FBI that Mr. Bower's execution

date had been stayed.  (See Notice of Recent Development dated July 7, 2008.)

(32)    By letter dated July 21, 2008, FBIHQ advised plaintiff that it had re-reviewed 816

---

[4]  Plaintiff's request for an expedited schedule was denied by the Court on June 12, 2008.
Nevertheless, the FBI processed plaintiff's request on an expedited basis as a matter of discretion.

[5]  Plaintiff's counsel agreed to provide the FBI with a copy of the FBI's January 31, 2001
release because the FBI was unable to locate its prior release and since the release pre-dated
electronic preservation, no copies were available for the FBI to reprocess.

pages and was releasing 450 pages of re-processed material[6] with certain redactions in response

to FOIA/Privacy Act request number 1108962.  Certain information was being withheld pursuant

to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and FOIA Exemptions 2, 3, 5, 6, 7(C),

7(D), and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

FBIHQ assessed plaintiff a duplication fee of $35.00.  Plaintiff was advised that he could file an

administrative appeal in writing to the DOJ OIP, within sixty days.  (See Exhibit Y.)

    (33)    On August 22, 2008, the parties provided the Court with a Status Report.  Plaintiff

requested that the FBI search for additional responsive documents and provide a Vaughn index

for any documents withheld in their entirety.  Plaintiff indicated that the parties would confer at a

later date with respect to procedures for the release of additional information about some of the

documents that were redacted.  Plaintiff agreed that it would not challenge redactions of agents'

names or information about alleged extramarital affairs of any of the victims.  (See Status Report

dated August 22, 2008.)  Accordingly, deletions relating to those categories are not addressed in

this Declaration.

    (34)    By letter dated October 10, 2008,[7] FBIHQ advised plaintiff that it had re-reviewed

1,944 pages and was releasing 1,130 pages of material[8] with certain redactions in response to

FOIA/Privacy Act request number 1108962-001.  Certain information was being withheld

---

    [6] The FBI processed specific pages (subset provided by plaintiff) from file DL 179B-97,
Sections 1, 2, 3, 4, 5, A and 1A, as requested.  In addition, the FBI re-reviewed and provided
plaintiff four pages found in file HQ 63-18573.

    [7] The FBI's letter of October 10, 2008, incorrectly stated that there were 1,944 pages
reviewed and 1,130 pages released.  The correct page count is 1,948 pages reviewed and 1,370
pages released to plaintiff.

    [8] The "entire" file contents of file DL 179B-97, Sections 1, 2, 3, 4, 5, A, 1A and file
HQ 63-18573 were re-processed by the FBI as requested by plaintiff.

pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and FOIA Exemptions 2, 3, 5, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). FBIHQ assessed plaintiff a duplication fee of $68.00. Plaintiff was advised that he could file an administrative appeal in writing to the DOJ OIP, within sixty days. (See Exhibit Z.)

(35)    Plaintiff contacted the FBI via telephone on November 11, 2008 to advise that he was requesting defendant to provide a Vaughn index on any documents withheld in their entirety. Additionally, plaintiff indicated that he would provide defendant nineteen (19) additional documents to Vaughn.

(36)    On November 12, 2008, the parties had a telephonic conference with the Court to advise of the status of the case. The parties agreed that defendant would provide a Vaughn index to plaintiff on or before January 30, 2009, with respect to all documents withheld in their entireties, as well as 19 additional documents that plaintiff provided to defendant on November 12, 2008. Defendant did not receive that additional material until the day of the telephonic conference. (See Minute Order dated November 20, 2008.)

### EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(37)    The Central Records System ("CRS") enables the FBI to maintain information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity,

or foreign intelligence matter (or program).  Certain records in the CRS are maintained at

FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in

those field offices.  Although the CRS is primarily designed to serve as an investigative tool, the

FBI searches the CRS for documents that are potentially responsive to FOIA/Privacy Act

requests.  The mechanism that the FBI uses to search the CRS is the Automated Case Support

System ("ACS").

(38)    On or about October 16, 1995, the ACS system was implemented for all Field

Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that

were previously automated.  ACS can be described as an internal computerized subsystem of the

CRS.  Because the CRS cannot electronically query the case files for data, such as an individual's

name or social security number, the required information is duplicated and moved to the ACS so

that it can be searched.  More than 105 million records from the CRS were converted from

automated systems previously utilized by the FBI.  Automation did not change the CRS; instead,

automation has facilitated more economic and expeditious access to records maintained in the

CRS.

(39)    The retrieval of data from the CRS is made possible through the ACS using the

General Indices, which are arranged in alphabetical order.[9]  Entries in the General Indices fall

into two categories:

> (a) A "main" entry — A "main" entry, or "main" file, carries the
> name corresponding with a subject of a file contained in the CRS.

---

[9] The General Indices, which became fully automated on September 24, 1987, also
include Index cards which allow a manual search for records prior to that date.

(b) A "reference" entry — "Reference" entries, sometimes called
"cross-references" are generally only a mere mention or reference
to an individual, organization, or other subject matter contained in
a document located in another "main" file on a different subject
matter.

(40)     Searches made in the General Indices to locate records concerning a particular

subject, such as National Security Letters, are made by searching the subject requested in the

index.

(41)     The ACS consists of three integrated, yet separately functional, automated

applications that support case management functions for all FBI investigative and administrative

cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open,

assign, and close investigative and administrative cases as well as set, assign, and track leads.

The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens

a case.  The field offices that receive leads from the OO are referred to as Lead Offices ("LOs").

When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by

FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the

investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of the

UCFN is as follows:  "111" indicates the classification for the specific type of investigation;

"HQ" is the abbreviated form used for the Office of Origin of the investigation, which in this

case is FBI Headquarters; and "12345" indicates the individual case file number for the particular

investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository

13

for the FBI's official text-based documents.  ECF supports the universal serial concept in that only the creator of a document serializes it into a file.  This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

      (c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.  Only the OO is required to index; however, the LOs may index additional information as needed.  UNI, an index of approximately 99.9 million records, functions to index names to cases, and to search names and cases for use in FBI investigations.  Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

    (42)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") - and on occasion, support employees - assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ.  The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular

subject matter or individual, i.e., Lester L. Bower, Jr.; the investigation of October 8, 1983

murders of Jerry Mac Brown, Phillip Boyce Good, Ronald Howard Mayes and Bobby Glen

Tate -- specifically, files: DL 179B-97 and HQ 63-18573.

### SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(43)    In response to plaintiff's request for information concerning Lester L. Bower, Jr.,

the investigation of the October 8, 1983 murders of Jerry Mac Brown, Phillip Boyce Good,

Ronald Howard Mayes and Bobby Glen Tate -- specifically, files DL 179B-97 and HQ 63-18573,

FBIHQ searched the CRS using Lester L. Bower's name, as well as the names of Jerry Mac

Brown, Phillip Boyce Good, Ronald Howard Mayes, and Bobby Glen Tate in order to locate any

main investigatory files or references maintained at FBIHQ and/or the Dallas Field Office.  As a

result of the FBI's search efforts, one main multi-subject file (DL 179B-97) and two main files

(HQ 63-18573 and 95-259626)[10] were identified as responsive to plaintiff's request.  After

careful review of the documents involving Lester L. Bower, Jr. and the investigation of the

October 8, 1983 murders of Jerry Mac Brown, Phillip Boyce Good, Ronald Howard Mayes, and

Bobby Glen Tate, the FBI processed and released the documents in part; information was

withheld pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and FOIA Exemptions

2, 3, 5, 6, 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(2), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D),

and (b)(7)(E).  The withholding of this information pursuant to these FOIA/Privacy Act

exemptions will be addressed in greater detail infra.

(44)    Additionally, in response to plaintiff's request for information concerning

---

[10]  Files 63-HQ-18573 and 95-HQ-259626 were consolidated into one file.

15

Lester L. Bower, Jr., the FBI identified a potentially responsive file, but initially was unable to

locate the file. However, after further search efforts, the file was successfully located. On

January 30, 2009, the FBI processed and released two pages of material to the plaintiff.

Information was withheld pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and

FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C). The FBI withheld the

names of two FBI agents, the disclosure of which would constitute a clearly unwarranted and

unwarranted invasion of privacy. There were no other redactions of information in the

document. (See Exhibit BB.) The FBI recently discovered that it had omitted a newspaper article

from the January 30, 2009 release and will release the article in its entirety to plaintiff in the

immediate future.

## EXPLANATION OF THE CODED FORMAT USED FOR THE JUSTIFICATION OF DELETED MATERIAL

(45)    All documents were processed to achieve maximum disclosure consistent with the

access provisions of the Privacy Act and the FOIA. Every effort was made to provide plaintiff

with all material in the public domain and with all reasonably segregable portions of releasable

material. No reasonably segregable, nonexempt portions were withheld from plaintiff. To

further describe the information withheld could identify the very material which the FBI seeks to

protect. Plaintiff specifically requests Vaughn coding with respect to all pages withheld in full

and select pages[11] released in part. (See Exhibits AA, numbered with the prefix of

"ROTH/BOWER" and the corresponding number at the bottom right-hand corner of each page.)

---

[11]  Plaintiff selected the following pages for Vaughn coding: ROTH/BOWER-33-49, 74,
76, 82, 90-93, 97-101, 108, 111-113, 128-130, 137-146, 203-232, 254, 256, 314, 457, 460, and
477-478.

The exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are Privacy Act Exemption (j)(2), and FOIA Exemptions 2, 3, 5, 6, 7(C), 7(D), and 7(E).

(46)    Copies of the pages contain, on their face, coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid the Court's and plaintiff's review of the FBI's explanations of FOIA exemptions used to withhold the protected material.  Each instance of information withheld on the attached documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to "Exemption (b)(7)(C)" of the FOIA concerning an "Unwarranted Invasion of Privacy."  The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into the more specific subcategory, "Names and/or Identifying Information of Non-FBI Federal Law Enforcement Employees."  Listed below are the categories used to explain the FOIA exemptions asserted to withhold the protected material.

## SUMMARY OF JUSTIFICATION CATEGORIES

**Category (b)(2)**          **Internal Rules and Practices**

(b)(2)-1                      Information Related to Polygraphs
                             (Cited in conjunction with (b)(7)(E)-1)

(b)(2)-2                      Confidential Source Symbol Number
                             (Cited in conjunction with (b)(7)(D)-3)

**Category (b)(3)**          **Information Withheld Pursuant to Statute**

(b)(3)-1                      Federal Grand Jury Information (Rule 6(e) of the Federal
                             Rules of Criminal Procedure)

17

| **Category (b)(5)** | **Privileged Information** |
|---|---|
| (b)(5)-1 | Deliberative Process Privilege |

| **Categories (b)(6) and (b)(7)(C)** | **Clearly Unwarranted Invasion of Personal Privacy; Unwarranted Invasion of Personal Privacy** |
|---|---|
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information Concerning Local Law Enforcement Personnel |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information Concerning Third Parties Merely Mentioned |
| (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information of State and/or Local Government Personnel |
| (b)(6)-4 and (b)(7)(C)-4 | Names and/or Identifying Information of Third Parties of Investigative Interest |
| (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Third Parties who Provided Information to FBI |
| (b)(6)-6 and (b)(6)(C)-6 | Names and/or Identifying Information of Commercial Institution Personnel |

| **Category (b)(7)(D)** | **Confidential Source Material** |
|---|---|
| (b)(7)(D)-1 | Information Provided by a Local Law Enforcement Agency |
| (b)(7)(D)-2 | Names and/or Information Provided by Third Parties under an "Implied" Assurance of Confidentiality (Cited at times in conjunction with (b)(6)-5 and (b)(7)(C)-5) |
| (b)(7)(D)-3 | Confidential Source Symbol Number (Cited in conjunction with (b)(2)-2) |
| (b)(7)(D)-4 | Information Provided by Source Symbol Numbered Informant (Cited in conjunction with (b)(6)-5 and (b)(7)(C)-5) |
| (b)(7)(D)-5 | Names and/or Information Provided by Parties under an "Express" Assurance of Confidentiality (Cited in conjunction with (b)(6)-5 and (b)(7)(C)-5) |

| **Category (b)(7)(E)** | **Investigative Technique/Procedures** |
|---|---|
| (b)(7)(E)-1 | Information Related to Polygraphs (Cited in conjunction with (b)(2)-1) |

## JUSTIFICATION FOR REDACTIONS

(47)    The paragraphs that follow explain defendant's rationale for withholding each

particular category of information under the specific exemption categories described above.

## PRIVACY ACT EXEMPTION (j)(2)

(48)    The investigatory records at issue are part of the FBI's CRS and were compiled as

a result of the FBI's legitimate law enforcement investigation of a murder investigation involving

the execution-style slaying of four people in Sherman, Texas, on October 8, 1983.  Local law

enforcement requested assistance from the FBI with the criminal investigation under several

jurisdictional bases, including Extortionate Credit Transactions, 18 U.S.C. § 894, Conspiracy

Against Citizens Rights, 18 U.S.C. § 241, Interstate Transportation of Stolen Motor Vehicle (or

Aircraft), 18 U.S.C. § 2312, and the Hobbs Act, 18 U.S.C. § 1951, Interference With Commerce

by Threats or Violence.  Accordingly, these files are exempt from disclosure pursuant to

Exemption (j)(2) of the FOIA and Privacy Act, in conjunction with 28 C.F.R. § 16.96.  Although

access to the records at issue was denied under the Privacy Act, the referred documents were

processed under the access provisions of the FOIA to achieve maximum disclosure.

## EXEMPTION (b)(2)
## INFORMATION RELATED SOLELY TO THE
## RULES AND PRACTICES OF AN AGENCY

(49)    5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the

internal personnel rules and practices of an agency."  This exemption protects routine internal

19

administrative matters and functions of the FBI which have no effect on the public at large. Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures ("Low" 2). Moreover, FOIA Exemption (b)(2) also protects internal personnel rules and practices of the FBI where disclosure may risk circumvention of the law ("High" 2). For example, "Low" 2 has been asserted to protect confidential source symbol numbers; and "High" 2 has been asserted to protect information used by the FBI to effectively support its investigatory efforts through the use of polygraph examinations.

(50)    This exemption protects routine internal administrative matters and functions of the FBI which have no effect on the public at large. Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures.

### (b)(2)-1        Information Related to Polygraphs

(51)    Exemption (b)(2)-1 has been asserted to withhold information pertaining to logistical considerations involved in polygraph examinations in the records responsive to plaintiff's request. This information is internal to the FBI and used to carry out a law enforcement technique. This information pertains solely to the FBI's need to effectively support its investigatory efforts through the use of polygraph examinations. The release of this information could significantly risk circumvention of the FBI's law enforcement ability by providing those intent on breaking the law with information about FBI polygraph administration. This information would enable these individuals to employ countermeasures that could defeat the usefulness of the polygraph examination. Exemption (b)(2)-1 ("High") is cited in conjunction with Exemption (b)(7)(E)-1 on the following pages: ROTH/BOWER-313, 319, 613, 1262, 1264-

1265, 1268-1270, 1362-1363, 1365-1378, 1381-1388, 1418, 1420-1421, and 1450-1459.[12]

### (b)(2)-2        Confidential Source Symbol Numbers

(52)    Exemption (b)(2)-2 has been asserted in conjunction with Exemption (b)(7)(D)-2

to protect the permanent source symbol numbers of confidential sources of the FBI. The FBI

assigns permanent source symbol numbers in sequential order to confidential informants who

report information to the FBI on a regular basis pursuant to an "express" assurance of

confidentiality. The symbol number is used as an administrative reporting tool to protect the

actual, sensitive identity of an informant in written documents generated by the FBI. A source

symbol number is comprised of a two-letter abbreviation which identifies the particular FBI field

office where the symbol-numbered informant is operating or has operated, followed by a

sequentially assigned number, which is given to only one informant. As such, this number is a

unique identifier of a specific informant. Release of these source symbol numbers would

indicate both the scope and location of FBI informant coverage within a particular geographic

area. Using a fictitious source symbol number "NY 1234," the two-letter abbreviation "NY "

reveals that this in an informant of the New York Field Office and he/she is the 1,234th symbol

numbered informant of that office. Assuming that the informant's name is "JOHN DOE," the

source symbol number would be used in all written reports in which DOE provided information

to the FBI. Therefore, every time the source symbol number "NY 1234" is released, the reader of

---

[12]   The FBI added  Exemption (b)(2) as an additional basis for withholding along with the
previous assertion of Exemption (b)(7)(E) on Bates pages: ROTH/BOWER 313, 319, 613, 1262,
1268, 1362-1363, 1388, 1450, 1452-1459. This addition was made to maintain consistency with
the FBI's current practice of citing both exemptions to protect information that if revealed could
allow circumvention of law enforcement techniques.

the document would know that the informant represented by this symbol number is DOE. In this case, the FBI did not refer to the sources by their true names. Instead, the sources were referred to only by their individually-assigned permanent source symbol numbers. The FBI obtained information from these confidential sources regarding the criminal activities of Lester L. Bower, Jr. and other individuals who were of investigative interest to the FBI.

(53)   If the FBI were to disclose the confidential source symbol numbers of these informants, their identities could be ascertained by persons knowledgeable about the FBI investigation of Lester L. Bower, Jr. and other individuals of investigative interest. Furthermore, if the FBI disclosed their identities, the informants, as well as their families, could be subjected to embarrassment, humiliation, and/or physical or mental harm. Disclosure of source symbol numbers at various times and in various documents could identify these confidential FBI sources because such disclosures would reveal the connections of these confidential informants to the subject matters of these documents. Repeated release of these confidential source symbol numbers along with the information provided by these confidential sources would narrow the possibilities of their true identities. This is especially true inasmuch as each confidential source symbol number is assigned to only one confidential informant.

(54)   Moreover, the disclosure of these confidential informants' identities would have a chilling effect on the activities and cooperation of other FBI confidential informants. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this confidence that these informants can be persuaded to continue providing valuable assistance in the future. Accordingly, because these

22

source symbol numbers are related solely to the FBI's internal practices, because the disclosure of

these source symbol numbers would not serve any public interest, and because the disclosure of

these source symbol numbers would impede the effectiveness of the FBI, the FBI properly

withheld this information pursuant to FOIA Exemption (b)(2)-2.  Exemption (b)(2)-2 ("Low"),

which has been cited in conjunction with Exemption (b)(7)(D)-3, is invoked on the following

pages: ROTH/BOWER-76, 108, 112 and 457.

### EXEMPTION (b)(3)
### INFORMATION PROTECTED BY STATUTE

(55)    5 U.S.C. § 552 (b)(3) exempts from disclosure information which is:
specifically exempted from disclosure by statute . . . provided that such
statute (A) requires that the matters be withheld from the public in such a
manner as to leave no discretion on the issue, or (B) establishes particular
criteria for withholding or refers to particular types of matters to be
withheld.

### (b)(3)-1        Federal Grand Jury Information

(56)    Exemption (b)(3)-1 was asserted in conjunction with Rule 6(e) of the Federal

Rules of Criminal Procedure to withhold Federal Grand Jury information.  It is well-established

that Rule (6)(e) embodies a broad, sweeping policy of preserving the secrecy of grand jury

material regardless of the substance in which the material is contained.  In the investigative files

responsive to plaintiff's request, only that information which explicitly discloses matters

occurring before a Federal Grand Jury has been withheld pursuant to Exemption (b)(3)-1.[13]

Specifically, Federal Grand Jury subpoenas, as well as the names, identifying information of

---

[13]  The FBI asserted Exemptions (b)(6) and (b)(7)(C) in conjunction with Exemption
(b)(3) on the following pages:  ROTH/BOWER-275, 663, 956, 958, 1549-1559, and 1561-1571.

individuals subpoenaed to testify before the Federal Grand Jury and information that identifies

specific records subpoenaed by the Federal Grand Jury were withheld pursuant to this exemption.

The disclosure of such details would clearly violate the secrecy of the grand jury proceedings and

could reveal the inner workings of the federal grand jury that considered this case.  Exemption

(b)(3)-1 is invoked on the following pages:  ROTH/BOWER-275, 663-664, 955-956, 958, 1549-

1559, and 1561-1571.[14]

**EXEMPTION (b)(5)**
**PRIVILEGED INFORMATION**

(57)    Exemption 5, 5 U.S.C. § 552 (b)(5), allows the FBI to protect information

contained in "inter-agency or intra-agency memorandums or letters which would not be available

by law to a party other than an agency in litigation with the agency."  This exemption has been

construed to exempt those documents or information normally privileged in the civil discovery

context, including, as is the case here, under the deliberative process privilege.

**(b)(5)-1**        **Deliberative Process Privilege**

(58)    Exemption 5 has been construed to exempt those documents or information

normally privileged in the civil discovery context, including specifically the deliberative process

privilege.  The deliberative process privilege protects the internal deliberations of the government

by exempting from release recommendations, analyses, speculation and other non-factual

information prepared in anticipation of decision-making.  Exemption 5 allows for the

---

[14]  Pursuant to Mr. Roth's request for reprocessing the documents previously released to him, the FBI reviewed the original documents and released more information to him with respect to Exemption (b)(3) on Bates pages ROTH/BOWER 560-563, 952-953, 1300, 1311-1312, 1549, and 1561.  The additional release was made to achieve maximum disclosure consistent with the access provisions of the FOIA.

24

withholding of material that contains -- or was prepared in connection with -- the formulation of

opinions, advice, evaluations, deliberations, policy formulation, proposals, conclusions or

recommendations.  Release of this type of information would have an inhibitive effect upon the

development of policy and administrative direction.  Furthermore, exempting such documents

from disclosure also protects against public confusion that might result from preliminary

disclosure of opinions and information that do not, in fact, reflect the final views or policies of

the FBI.  The privilege is designed to protect not only documents but also the integrity of the

deliberative process itself where the exposure of the process would result in harm.  FBI

employees would hesitate to offer their candid and conscientious opinions to superiors or

coworkers if they knew that their opinions of the moment might be made a matter of public

record at some future date.

(59)    Exemption 5 was asserted to withhold seven pages -- a draft search warrant and

supporting affidavit from a law enforcement officer, which details preliminary thoughts and

approach to the investigation involving plaintiff.  The draft search warrant and affidavit are

unsigned and undated.  There is no other indicia in the file which would lead to the conclusion

that these documents were anything other than a draft, and there is no final, file-stamped version

of the document which would indicate that it had been filed with the court.  As a result, the FBI

has appropriately withheld information pursuant to Exemption (b)(5)-1 on the following pages:

ROTH/BOWER-568-574.

(60)    The FBI initially asserted Exemption 5 to withhold three pages of documents in

their entireties.  These documents consist of a letter from the Executive Office for United States

Attorneys ("EOUSA"), enclosing information from local law enforcement. These documents

provide preliminary thoughts and investigative approaches to the investigation of Mr. Bower.

Once the FBI determined that it had inadvertently processed these documents as FBI documents,

when in fact the documents belonged to EOUSA (another component of DOJ), the FBI consulted

with EOUSA regarding the processing. EOUSA concurred with the FBI's initial processing and

advised the FBI to withhold all three pages in their entirety, asserting Exemption (b)(7)(C) in

addition to Exemption (b)(5) on the following pages: ROTH/BOWER-79-81.

### EXEMPTION (b)(6) AND (b)(7)(C)
### CLEARLY UNWARRANTED AND UNWARRANTED
### INVASION OF PERSONAL PRIVACY

(61)    5 U.S.C. § 552(b)(6) exempts from disclosure "personnel and medical files and

similar files when the disclosure of such information would constitute a clearly unwarranted

invasion of personal privacy. Similarly, 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only to
> the extent that the production of such law enforcement records or
> information . . . could reasonably be expected to constitute an unwarranted
> invasion of personal privacy.[15]

### EXEMPTION (b)(7) THRESHOLD

(62)    Exemption (b)(7) of the FOIA protects from mandatory disclosure records or

information compiled for law enforcement purposes, but only to the extent that disclosure could

---

[15]   The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C).
Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of
personal privacy" and the test for (b)(7)(C) uses the lower standard of "could reasonably be
expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing
required by both exemptions is sufficiently similar to warrant a consolidated discussion. The
privacy interests are balanced against the public's interest in disclosure under the analysis of both
exemptions.

reasonably be expected to cause one of the harms enumerated in the subpart of the exemption. See 5 U.S.C. § 552(b)(7).

(63)    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.  The records responsive to plaintiff's requests relate to a murder investigation involving the execution-style slaying of four people in Sherman, Texas, on October 8, 1983.  Local law enforcement requested assistance from the FBI with the criminal investigation under several jurisdictional bases, including Extortionate Credit Transactions, 18 U.S.C. § 894, Conspiracy Against Citizens Rights, 18 U.S.C. § 241, Interstate Transportation of Stolen Motor Vehicle (or Aircraft), 18 U.S.C. § 2312, and the Hobbs Act, 18 U.S.C. § 1951, Interference With Commerce by Threats or Violence.  Thus, there is no doubt that this investigation falls within the law enforcement duties of the FBI.  Accordingly, the information readily meets the threshold requirement of Exemption (b)(7).  The remaining inquiry is whether its disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," "disclose the identity of a confidential source," and "could reasonably be expected to risk circumvention of the law." In this case, the harm that could reasonably be expected to result from disclosure concerns the unwarranted invasion of personal privacy (Exemption (b)(7)(C)), revealing the identity of confidential sources (Exemption (b)(7)(D)), and revealing sensitive law enforcement techniques (Exemption (b)(7)(E)).

27

(64)    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in the documents against any public interest in disclosure.  In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appeared in the documents at issue.  In making this analysis, the public interest was determined to be information which would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In this case, the FBI concluded that the information should be withheld under Exemptions (b)(6) and (b)(7)(C), and determined that public interest in disclosure did not outweigh individuals' privacy interests.

### (b)(6)-1 and (b)(7)(C)-1    Names and/or Identifying Information Concerning Local Law Enforcement Personnel

(65)    Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted to withhold the names of -- and identifying information for -- local law enforcement employees.  Identifying information withheld includes the title and rank of these employees.  These employees were acting in their official capacity and aided the FBI in the law enforcement investigative records responsive to plaintiff's request.  Local law enforcement employees were involved with interviewing cooperating witnesses, sources, and reviewing materials compiled as a result of the investigation of Mr. Bower and others.  Law enforcement assignments to any particular investigation are not by choice.  Publicity (adverse or otherwise) regarding any particular

investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. The privacy consideration is also to protect law enforcement employees, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations. Law enforcement employees conduct official inquiries into various civil and criminal violation cases. They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years. These individuals may seek revenge on law enforcement employees involved in a particular investigation. The publicity associated with the release of an employee's identity in connection with a particular investigation could trigger hostility toward a particular employee. Release of the identities of these law enforcement employees could subject them as individuals to unnecessary, unwarranted harassment which would constitute a clearly unwarranted and unwarranted invasion of privacy. Furthermore, these individuals could become a prime target for compromise if their identities were known. There is no public interest to be served in releasing the identities of these individuals. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Exemptions (b)(6)-1 and (b)(7)(C)-1 are invoked on the following pages: ROTH/BOWER-36, 46, 97-98, 108, 111-113, 133, 135, 140, 144-146,148-160, 162-168, 170-172, 176-177, 181-188, 190-192, 194-202, 206, 254-255, 282-283, 285-289, 313, 319, 568, 570-572, 956, 958, 1186-1187, 1409-1411, 1436, 1438-1439, and 1441-1448.

**(b)(6)-2 and (b)(7)(C)-2**        **Names and/or Identifying Information of Third Parties Merely Mentioned**

(66)    Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted to withhold the names of third parties merely mentioned in documents concerning the criminal investigation of plaintiff. The FBI obtained information concerning third parties who came into contact with plaintiff during the course of his activities. These individuals were not of investigative interest to the FBI. These third parties maintain legitimate privacy interests in not having this information disclosed. If the FBI disclosed their names, the disclosure would reveal that these third parties were connected with the FBI's investigation of plaintiff in some way. Disclosure of these third parties' names in connection with the FBI's investigation of plaintiff's activities carries an extremely negative connotation. Disclosure of their identities could subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. Accordingly, the FBI determined that these third parties maintained a substantial privacy interest in not having information about them disclosed. After identifying the substantial privacy interests these individuals maintain, the FBI balanced their right to privacy against the public interest in the disclosure. The FBI has determined that there is no public interest . Thus, disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Exemptions (b)(6)-2 and (b)(7)(C)-2 are invoked on the following pages: ROTH/BOWER-39, 42, 47, 49, 76, 91, 93, 108, 112, 114-123, 128, 130, 133, 135, 139-146, 148-150, 153-161, 167, 169, 173-180, 184, 186, 188-202, 204-232, 255-256, 275, 282, 284-289, 312-313, 318-319, 457-461, 477-478, 958, 1143-1147, 1149, 1151-1158, 1160-1166, 1168-1172, 1174-1175, 1177-1180, 1182, 1187, 1268-1269, 1273, 1314-1320, 1404, 1406, 1409-1412, 1436,

30

1438, 1440, 1442-1448, 1477-1491, 1500-1512, 1514-1515, 1517-1518, 1520, 1522-1529, 1531-1536, 1546, 1550-1559, and 1568-1571.

### (b)(6)-3 and (b)(7)(C)-3     Names and/or Identifying Information of State and/or Local Government Personnel

(67)     Exemptions (b)(6)-3 and (b)(7)(C)-3 have been asserted to withhold the names and identifying work locations of State and/or local government personnel who were involved with the investigation of plaintiff.  The relevant inquiry here is whether public access to this information would violate a viable privacy interest of the subjects of such information. Disclosure of this identifying information could subject these government personnel to unauthorized inquiries and harassment which could constitute a clearly unwarranted and unwarranted invasion of their personal privacy.  The rational for protecting government personnel is the same as that for FBI employees.  In balancing the legitimate privacy interests against any public interest in disclosure, the FBI has determined that there is a complete lack of any bona fide public interest in disclosure of this information because disclosure would not shed light on the operations and activities of the federal government. Accordingly, the FBI properly withheld this information pursuant to Exemptions (b)(6)-3 and (b)(7)(C)-3 on the following pages: ROTH/BOWER-45-46, 132, 150, 156, 165, 169, 185-187, 202, 283, 285, and 571.

### (b)(6)-4 and (b)(7)(C)-4     Names and/or Identifying Information of Third Parties of Investigative Interest

(68)     Exemptions (b)(6)-4  and (b)(7)(C)-4 have been asserted to withhold the names of third parties contained in various communications which reflect the internal discussion of individuals who are the subjects of  law enforcement investigations.  These individuals were of

investigative interest to the FBI and are discussed in numerous communications.

(69)    Disclosure of the identities of third parties in this context could cause unsolicited and unnecessary attention to be focused on them and disclosure may embarrass them. For these reasons, the FBI has determined that the third-party individuals mentioned in the responsive communications maintain a strong privacy interest in not having their identities disclosed.

(70)    After identifying the substantial privacy interest of the third parties in the communications, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of third parties' names and identifying information will not shed light on the operations and activities of the FBI. Accordingly, the FBI determined that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of personal privacy. Thus, the FBI properly withheld the names of these third parties pursuant to Exemptions (b)(6)-4 and (b)(7)(C)-4 on the following pages:  ROTH/BOWER-28-31, 35-36, 38-43, 46-49, 82, 91-93, 98-101, 108, 111-113, 128-130, 141-142, 153, 186, 190, 192, 195-196, 198, 206-207, 282-283, 286-290, 312-313, 318-319, 781, 1071-1138, 1186-1193, 1197, 1199, 1201, 1203, 1205, 1261-1262, 1264-1265, 1272-1273, 1362-1363, 1365-1378, 1416, 1436, 1438, 1445-1448, 1493-1494, 1496-1497, 1538-1539, 1541-1542, 1551-1559, and 1562-1570.

### __(b)(6)-5 and (b)(7)(C)-5__      __Names and/or Identifying Information of Third Parties who Provided Information to FBI__

(71)    Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted, at times in conjunction with Exemptions (b)(7)(D)-2 or (b)(7)(D)-5, to protect the names and identifying information of individuals who were interviewed by the FBI during the course of the FBI's investigation of

32

plaintiff and others.  The FBI has withheld the following identifying information concerning

these third parties: addresses, dates of birth, Social Security Numbers, and other personal

information.

     (72)    The FBI has found that information provided by individuals during an interview is

one of the most productive investigative tools used by law enforcement agencies.  The largest

roadblock to successfully obtaining the desired information through an interview is fear by the

interviewee that his/her identity will possibly be exposed and consequently he/she could be

harassed, intimidated, or threatened with legal, economic reprisal or possible physical harm.  To

surmount these obstacles, persons interviewed by the FBI must be assured that their names and

personal identifying information will be held in the strictest confidence.  The continued access by

the FBI to persons willing to honestly relate pertinent facts bearing upon a particular

investigation far outweighs any benefit plaintiff might derive from being furnished the names of

those who cooperated with the FBI.

     (73)    Thus, the FBI has determined that the third party interviewees maintain a

substantial privacy interest in not having their identities disclosed.  After identifying the

substantial privacy interests of the third parties interviewed during the course of the FBI's

investigation of plaintiff, the FBI balanced these individuals' right to privacy against the public

interest in the disclosure.  The FBI could identify no discernible public interest in the disclosure

of this information because the disclosure of the third parties' names and identifying information

would not shed light on the operations and activities of the FBI.  Accordingly, the FBI concluded

that the disclosure of this information would constitute a clearly unwarranted and unwarranted

invasion of their personal privacy.  The FBI properly withheld this information pursuant to

Exemptions (b)(6)-5 and (b)(7)(C)-5 on the following pages: ROTH/BOWER-76, 82, 92, 98-99,

108, 111-113, 129, 138, 140-141, 203-204, 186-187, 190-191, 196-197, 200-202, 254-256, 275,

282-283, 457, 477, 570, 612-613, 979-980, 1048-1049, 1261, 1267-1273, 1275, 1381-1388,

1416, 1418-1421, 1438, 1450-1459, 1538, and 1545-1547.

### (b)(6)-6 and (b)(7)(C)-6    Names and/or Identifying Information of Commercial Institution Personnel

(74)    Exemptions (b)(6)-6 and (b)(7)(C)-6 have been asserted to withhold the names,

titles, and business addresses of commercial employees who cooperated and provided assistance

to the FBI during the course of this investigation.  These sources provided information to the FBI

in their official capacities, and to identify them could subject them to unofficial inquiries not

anticipated by their contact with the FBI.  This would result in a clearly unwarranted  and

unwarranted invasion of personal privacy inasmuch as these individuals would be subjected to

unnecessary public attention, harassment, retaliation, and/or physical harm.  Moreover, the FBI's

ability to obtain information quickly and discreetly in future law enforcement investigations

would be negatively affected.  There is no public interest to be served by releasing the identities

of these individuals.  Accordingly, the FBI concluded that the disclosure of this information

would constitute a clearly unwarranted and unwarranted invasion of their personal privacy.

Exemptions (b)(6)-6 and  (b)(7)(C)-6 are invoked on the following pages: ROTH/BOWER-46-

48, 157-158, 173, 175-177, 183, 186, 188, 213, 215, 218-219, 457, 560-563, 570-571, 656, 663,

809-813, 883, 952-953, 958, 1044-1045, 1300, 1311-1312, 1443, 1545-1546, 1549, and 1561.

## EXEMPTION (b)(7)(D)
## CONFIDENTIAL SOURCE INFORMATION

(75)     5 U.S.C. § 552 (b)(7)(D) provides protection for:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of law enforcement records or
> information . . . could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or authority
> of any private institution which furnished information on a confidential
> basis, and, in the case of a record or information compiled by a criminal
> law enforcement agency conducting a lawful national security intelligence
> investigation, information furnished by a confidential source.

(76)     Numerous informants report to the FBI on a regular basis and are informants in

the common meaning of the term.  Some of the sources provide information under an "express"

assurance of confidentiality.  Further, during the course of an investigation, other individuals are

interviewed under circumstances from which an assurance of confidentiality can reasonably be

inferred or implied.  These individuals are considered to be confidential informants or sources

since they furnish information only with the understanding that their identities and the

information provided will not be divulged outside the FBI.  Information provided by these

individuals is singular in nature and if released, could reveal the informant's identity.

(77)     During the course of the FBI's investigation of plaintiff, FBI SAs sought the

assistance of numerous individuals to obtain information to aid its investigation.  Information

was provided by third parties under an implied assurance of confidentiality and by other third

parties who provided information under an express grant of confidentiality.

(78)     These individuals were placed directly in positions that could subject them to acts

35

of reprisal, harassment, and/or an unnecessary amount of public attention if the FBI disclosed the details of their cooperation. The FBI has learned through experience that individuals who provide information about subjects under investigation must be free to do so without fear of reprisal should their identities or information they provided be disclosed outside their confidential relationship with the FBI. Individuals who provide investigative information must be free to furnish that information to the FBI with complete candor and without the understandable tendency to hedge or withhold information out of fear that their names or their cooperation with the FBI will later be made public. Those who provide information in these investigations should be secure in the knowledge that their assistance and their identities will be held in confidence. The FBI asserted Exemption 7(D) to protect the identities of and information provided by third parties that provided information to the FBI.

### (b)(7)(D)-1    Information Provided by Local Law Enforcement Agency

(79)    Exemption (b)(7)(D)-1 is cited to protect source information provided to the FBI by a local law enforcement agency. Disclosure of this information could directly link the information to the individual who provided such information to the local law enforcement agency resulting in harm to that person and possibly that person's family. Publicity, adverse or otherwise, concerning an individual's participation and the information supplied in a particular FBI investigation would seriously impair their effectiveness in assisting with or participating in such future investigations. The publicity associated with the release of this information in connection with this investigation could trigger hostility towards the person providing the information. There is no public interest to be served by releasing this information.

36

(80)    Confidential source material protected by the assertion of Exemption (b)(7)(D)-1 includes information provided to the FBI from a local law enforcement agency or authority with an understanding of confidentiality.  The FBI, in connection with a wide variety of criminal and national security investigations, solicits and receives information regularly from state, local, and foreign agencies and authorities.  Inherent in the cooperative effort is the mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA and/or Privacy Act requests.  If disclosure of information provided in confidence were to be made public pursuant to FOIA and/or Privacy requests, cooperation between the FBI and those agencies and authorities would be greatly diminished, causing great detriment to effective law enforcement.  Accordingly, the FBI properly withheld this information pursuant to Exemption (b)(7)(D)-1.  Exemption (b)(7)(D)-1 is invoked on the following pages:  ROTH/BOWER-35-36, 46-47, 141-142, 148-152, 154-202, 206-207, 282-290, 1186-1193, 1404-1407, 1409-1412, 1436, and 1438-1448.

### (b)(7)(D)-2    Names and/or Information Provided by Third Parties under an "Implied" Assurance of Confidentiality

(81)    Exemption (b)(7)(D)-2 has been asserted at times in conjunction with Exemptions (b)(6)-5 and (b)(7)(C)-5 to protect the names, identifying information for, and information provided by, third parties to the FBI or other law enforcement agencies in the investigative files under an implied grant of confidentiality.  These third parties provided information concerning the criminal activities of plaintiff or other subjects who were of interest to the FBI or other law enforcement agencies.  These third party sources provided specific detailed information that is singular in nature concerning the criminal activities involving plaintiff, his associates, and/or

other subjects of this investigation.  Plaintiff and other subjects were arrested and convicted

based in part on information provided by these individuals.  The disclosure of the identities of

these individuals could have disastrous consequences, as detailed in the Exemption (b)(6)-5 and

(b)(7)(C)-5 discussion above.  These third parties provided information of value to the FBI

concerning this investigation, and in doing so, have placed themselves in harm's way should

plaintiff or his associates become aware of their cooperation with the FBI.

(82)    The information the third parties provided under an implied assurance of

confidentiality warrants the protection of the third party names as well as the singular

information they provided.  Thus, the FBI has properly withheld this information pursuant to

FOIA Exemption (b)(7)(D)-2.  Exemption (b)(7)(D)-2 has been cited at times in conjunction with

Exemption (b)(6)-5 and (b)(7)(C)-5 and is invoked on the following pages:  ROTH/BOWER-90-

91,132-135, 140, 153, 206-207, 254-256, 655-657, 979-980, 1049, 1277-1282, and 1289-1297.

### (b)(7)(D)-3    Confidential Source Symbol Number

(83)    Exemption (b)(7)(D)-3 has been asserted in conjunction with Exemption (b)(2)-2

to protect the permanent source symbol numbers of confidential sources of the FBI.  The FBI

assigns permanent source symbol numbers in sequential order to confidential informants who

report information to the FBI on a regular basis pursuant to an "express" assurance of

confidentiality.  The symbol number is used as an administrative reporting tool to protect the

actual, sensitive identity of an informant in written documents generated by the FBI.  A source

symbol number is comprised of a two-letter abbreviation which identifies the particular FBI field

office where the symbol-numbered informant is operating or has operated, followed by a

sequentially assigned number, which is given to only one informant. As such, this number is a

unique identifier of a specific informant. Release of these source symbol numbers would

indicate both the scope and location of FBI informant coverage within a particular geographic

area. Using a fictitious source symbol number "NY 1234," the two-letter abbreviation "NY "

reveals that this in an informant of the New York Field Office and he/she is the 1,234th symbol

numbered informant of that office. Assuming that the informant's name is "JOHN DOE," the

source symbol number would be used in all written reports in which DOE provided information

to the FBI. Therefore, every time the source symbol number "NY 1234" is released, the reader of

the document would know that the informant represented by this symbol number is DOE. In this

case, the FBI did not refer to the sources by their true names. Instead, the sources were referred

to only by their individually-assigned permanent source symbol numbers. The FBI obtained

information from these confidential sources regarding the criminal activities of Lester L.

Bower, Jr. and other individuals who were of investigative interest to the FBI.

     (84)    If the FBI were to disclose the confidential source symbol numbers of these

informants, their identities could be ascertained by persons knowledgeable about the FBI

investigation of Lester L. Bower, Jr. and other individuals of investigative interest. Furthermore,

if the FBI disclosed their identities, the informants, as well as their families, could be subjected

to embarrassment, humiliation, and/or physical or mental harm. Disclosure of source symbol

numbers at various times and in various documents could identify these confidential FBI sources

because such disclosures would reveal the connections of these confidential informants to the

subject matters of these documents. Repeated release of these confidential source symbol

numbers along with the information provided by these confidential sources would narrow the possibilities of their true identities. This is especially true inasmuch as each confidential source symbol number is assigned to only one confidential informant.

(85)    Moreover, the disclosure of these confidential informants' identities would have a chilling effect on the activities and cooperation of other FBI confidential informants. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this confidence that these informants can be persuaded to continue providing valuable assistance in the future. Accordingly, because these source symbol numbers are related solely to the FBI's internal practices, because the disclosure of these source symbol numbers would not serve any public interest, and because the disclosure of these source symbol numbers would impede the effectiveness of the FBI, the FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-3. Exemption (b)(7)(D)-3 in conjunction with Exemption (b)(2)-2 is invoked on the following pages: ROTH/BOWER-76, 108, 112, and 457.

### (b)(7)(D)-4    Information Provided by and/or Identifying Data Concerning Source Symbol Numbered Informants

(86)    Exemption (b)(7)(D)-4 has been asserted in conjunction with Exemptions (b)(6)-5 and (b)(7)(C)-5 to withhold the information provided and/or identifying data concerning source symbol numbered informants. The disclosure of this information may likely reveal a confidential source's identity. The disclosure of a source's identity would forever neutralize that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. It is only

40

with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. Exemption (b)(7)(D)-4 has been cited in conjunction with Exemptions (b)(6)-5 and (b)(7)(C)-5 and is invoked on the following pages: ROTH/BOWER-76, 108 and 457.

### (b)(7)(D)-5   Names and/or Information Provided by Third Parties under an "Express" Assurance of Confidentiality

(87)    Exemption (b)(7)(D)-5 has been asserted in conjunction with Exemption (b)(6)-5 and (b)(7)(C)-5 to protect the names, identifying information for, and information provided by third parties to the FBI during the course of the FBI's investigation under an express grant of confidentiality. In this case, two third-party individuals specifically requested their identities not be disclosed because they feared reprisal. Prior to conducting the interview, the FBI expressly promised the third-party interviewees that their identities and the information they provided would not be disclosed. This is evidenced by the words "PROTECT IDENTITY" when these individuals' names are referenced in the file. The words are a positive indication of an express assurance of confidentiality.

(88)    The FBI protected the contents of the interview conducted with these third parties because individuals who have knowledge of the crimes which gave rise to the FBI's investigation could clearly determine their identities. These sources provided valuable information that is detailed and singular in nature. The disclosure of the identities of these individuals could have disastrous consequences, as detailed in the Exemption (b)(6)-5 and (b)(7)(C)-5 discussion above. In addition, disclosure of the identities of these confidential sources who were expressly

41

promised confidentiality has wider implications. If the FBI were to disclose the identities of

confidential sources that entered into express agreements, that revelation would have a chilling

effect on the activities and cooperation of other FBI confidential sources in the future. The FBI

has found that it is only with the understanding of complete confidentiality that the aid of such

sources can be enlisted, and only through this confidence that these sources can be persuaded to

continue to provide valuable assistance in the future. Thus, the identity of, and the information

provided by sources who were expressly promised confidentiality were properly withheld

pursuant to FOIA Exemption (b)(7)(D)-5. Exemption (b)(7)(D)-5 has been cited in conjunction

with Exemption (b)(6)-5 and (b)(7)(C)-5 on the following pages: ROTH/BOWER-98-99, 111-

113, 129, 141, and 477.

### EXEMPTION (b)(7)(E)
### INVESTIGATIVE TECHNIQUES AND PROCEDURES

(89)    5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to
> the extent that the production of such law enforcement records or
> information . . . (E) would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would disclose guidelines
> for law enforcement investigations or prosecutions if such disclosure could
> reasonably be expected to risk circumvention of the law.

#### (b)(7)(E)-1    Information Related to Polygraphs

(90)    Exemption (b)(7)(E)-1 has been asserted to withhold information which would

reveal the use of various polygraph techniques which the FBI uses in the course of its

investigations. In this case, the FBI administered polygraphs in the course of its assistance to

local law enforcement in the murder investigation involving Mr. Bower. The documents that

42

were located, if disclosed, would reveal techniques used by FBI polygraphers and would allow

for circumvention of those techniques.  The release of this information would disclose the

identity and type of device used in electronic monitoring and logistical considerations involved in

polygraph examinations.  Such disclosures would enable subjects of FBI investigations to

circumvent these and similar techniques which the FBI is currently using.  The relative utility of

these techniques could be diminished if the actual techniques were released in this matter.  This

in turn would facilitate the accumulation of information by investigative subjects regarding the

circumstances under which the specific techniques were used or requested and the usefulness of

the information obtained.  Release of this type of information would enable criminals to educate

themselves about the techniques employed for the administration of polygraph examinations and

therefore allow these individuals to take countermeasures to circumvent the effectiveness of

these techniques and to continue to violate the law.  Exemption (b)(7)(E)-1 has been cited in

conjunction with Exemption (b)(2)-3 on the following pages: ROTH/BOWER-313, 319, 613,

1262, 1264-1265, 1268-1270, 1362-1363, 1365-1378, 1381-1388, 1418, 1420-1421, and 1450-

1459.[16]

## **CONCLUSION**

(91)    Plaintiff has been provided all responsive records pursuant to his FOIA/Privacy

Act requests to the FBI.  Furthermore, all segregable information has been released to plaintiff,

---

[16]   The FBI added Exemption (b)(7)(E) as an additional basis for withholding along with the previous assertion of Exemption (b)(2) on Bates pages:  ROTH/BOWER 313, 319, 613, 1262, 1268, 1270, 1362-1363, 1365-1378, 1381-1386, 1388, 1418, 1420, 1450, 1452-1459.  This addition was made to maintain consistency with the FBI's current practice of citing both exemptions to protect information that if revealed could allow circumvention of law enforcement techniques.

and no reasonably segregable portion of the withheld material can be released for all of the reasons explained above. The FBI carefully reviewed each of the documents for segregability purposes. As demonstrated above, the only information withheld by the FBI consists of information that would disclose internal practices, reveal Federal Grand Jury information protected by statute, reveal privileged information, infringe upon the personal privacy of third party individuals, disclose the identities of confidential sources, and disclose law enforcement techniques. The FBI is unable to segregate the information contained in these documents without revealing the protected information itself.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through BB attached hereto are true and correct copies.

Executed this 6 day of February, 2009.

DAVID M. HARDY
Section Chief
Record/Information Dissemination
 Section
Records Management Division
Federal Bureau of Investigation
Winchester, V.A.

44